Good morning, Your Honors. May it please the Court, Lisa Shiner on behalf of Appellant Bryan Laurienti. I would like to reserve two minutes for rebuttal. Your Honors, this was a fundamentally unfair sentencing. It's clear that the District Judge was simply tired of Mr. Laurienti's case. This was reflected in one, the District Court refused to rule or hold an evidentiary hearing on a material and disputed issue at sentencing. Two, imposed abusive trust enhancement contrary to this Court's en banc ruling in contraris. And three, refused to review the entirety of the mitigation materials presented by Defense Counsel and imposed a mid-range sentence to a first-time offender with an exemplary personal history. All of these factors are error, but I'd like to specifically address the first two. As to what I shall term the no-knowledge clause of Section 15, Titles of 15 United States Code 78 FFA, the statutory language itself states that no person shall be subject to imprisonment until he proves that he had no knowledge of such rule or regulation. What sort of proffer did he ever make to his lack of knowledge? Somebody who's been in that business for a long time, has taken tests, passed tests? I mean, we're talking about 10 v. 5, aren't we? Yes, Your Honor. And there indeed was a proffer in defendant's sentencing position. It was a statement that said, Mr. Laurienti has no knowledge of the rules and regulations under which he was prosecuted. Defense Counsel spoke on behalf of Mr. Laurienti, and it was a proffer. I mean, by proffer, I mean some detail, saying this is why I'm unaware of this. I mean, if it had been some obscure rule or regulation, that's one thing. Isn't that the most fundamental aspect of our securities laws? Well, Your Honor, it is difficult to prove a negative. Absolutely, I understand that. But probably purposefully. Go ahead. Well, but the burden was on the defendant, so he would have to prove a negative. And therefore, the question is, what did he do in his proffer to demonstrate that there was any chance he could prove a negative? Yes, Your Honor. Well, Mr. Laurienti, as a threshold requirement, stated that he had no knowledge of the rules under which he was prosecuted. So was he just going to get up and say I have no knowledge under oath? That was going to be the demonstration? Well, had there been a declaration, it would not have contained any more information. That was contained in the attorney proffer that he contained that he had no knowledge. But if the district court was unsatisfied with this mere assertion, it had the responsibility of further evaluating the statement by either making a factual finding, which it did not, or by making an evidentiary. You didn't make a Rule 32 argument here, which might have been a more successful one. In other words, if there was no finding, but you didn't make you're not complaining about that. Yes, Your Honor. Your Honor, we are asking, we did ask for a factual finding as to Mr. Laurienti's lack of knowledge as to 10b-5, as to the subpoena of 10b-5. But the argument in this Court is based on the lack of an evidentiary hearing. That's what you're arguing? Your Honor, we are arguing both the fact that the district court made no factual finding as to Mr. Laurienti's lack of knowledge. Also, as to the fact that there was no evidentiary hearing. The district court had the responsibility. If it did not accept Mr. Laurienti's statement at face value, it had the responsibility of further evaluating Mr. Laurienti's statement, either through an evidentiary hearing. How so? If you ask for an evidentiary hearing and you don't show me that there's anything to be heard, why do I have to give an evidentiary hearing? I mean, for instance, in a suppression issue. File a motion to suppress, figure out, well, there's nothing. I can hear this on the papers or whatever. I don't need to take testimony. Why isn't that the situation here? Well, Your Honor. It just seems to me that the defendant has to come forward and give the judge some basis to believe that it's simply not going to be a waste of time to hold an hour or a day's worth of evidentiary hearing. Your Honor, I agree, Your Honor. And Mr. Laurienti did explicitly state in his sentencing position that he had no knowledge, coupled with the request for an evidentiary hearing in his sentencing position. But the burden is on him. That's correct, Your Honor. If he was going to stand up and say I had no knowledge, there was no need for an evidentiary hearing. You already said that. Yes. We believe that that is a threshold requirement. An evidentiary hearing, if I were trial counsel, certainly there would have been the possibility of putting Mr. Laurienti on the stand. He did not testify at his own trial. The district court could be questioning, direct questioning of Mr. Laurienti. The government would have the opportunity to cross-exam Mr. Laurienti. And if, based on Mr. Laurienti's answers to the cross-examination, there is the possibility of having additional witnesses testify at this evidentiary hearing. Certainly. I'm sorry. Go ahead. I apologize. Go ahead. Certainly, at Mr. Laurienti's trial, he did present three witnesses, three former customers, who testified that Mr. Laurienti was very honest and never deceiving in his – in their dealings with him. There certainly could have been witnesses testifying to Mr. Laurienti's lack of knowledge. One question I had is that, in fact, this issue was – or a very similar one was, according to the prior opinion in this case, relevant to the conviction as well. Is that right? That is correct, Your Honor. In the prior appeal in this matter, it was addressed as a matter – as an element of the crime. Right. And in the prior appeal, it held that this 78-FFA was not an element of the crime. It was a partial affirmative defense to be argued as mitigation at sentencing. And therefore, that is why we bring it up as a sentencing matter. Well, I don't know what to say. I thought it said – it did say that a – well, go ahead. I'll find it. Go ahead. And, Your Honor, this is an essential fact, material to Mr. Laurienti's sentencing, because – and it's critical because Mr. Laurienti did not have been sentenced to a term of imprisonment. But it seems to me he got a term of imprisonment. Doesn't that implicitly reflect a factual finding by the judge, not expressed in the record, that he, in fact, had knowledge? He had met a burden of proof. Otherwise, he wouldn't have sentenced him to prison because he couldn't. Your Honor, this is a very, very specialized, very unusual type of statute. I cannot personally think of any other statute that addresses that the defendant would not be subject to term of imprisonment if he had no knowledge of that rule. Given the specialized nature and the unique nature of this statute, I think it deserved at least a factual finding by the district court that Mr. Laurienti either had no knowledge or there had to have been an evidentiary hearing held as to Mr. Laurienti's lack of knowledge. It's also critical here because 10b-5 is such a broadly worded provision. The reason why 7b-8 FFA came about, Congress enacted it because it was concerned about the great mass of regulations enacted by the Securities and Exchange Commission. The fact that someone could be prosecuted that covers many, many, many types of acts and someone could be prosecuted and sent to a term of imprisonment having no knowledge of the rule under which he was violated. Is it no knowledge of the rule or no knowledge of the rule's applicability to his conduct? No or no knowledge of the rule's applicability to his conduct. Okay. It's not simply the general. You don't know the text of the rule, but you don't understand the connection between what you're doing in this scheme or in this activity operation. That is correct, Your Honor. And certainly at the trial it was argued that the conduct for which Mr. Laurienti was convicted for not disclosing certain commissions on certain house stocks that he sold to customers, that was an argument at trial that that necessarily was not illegal conduct under 10b-5. That was the section of the conduct for which Mr. Laurienti was convicted. But shouldn't we require him to have then come forward and make that contention or at least renew that contention and support it with, you know, maybe go out and get other stockbrokers or whatever who say, Huh? Wait a minute. Are you kidding me? I mean, and you indicated there may be other witnesses, but again, where's the list? We want to call Tom Smith and Mary Brown and so forth to testify to this. Your Honor, it is difficult to speculate on what would have happened at an evidentiary hearing. Certainly Mr. Laurienti asserted that he had no knowledge. However, the district court had the responsibility of either ruling, accepting that statement, not accepting that statement and holding a factual, making a factual finding that it does, that Mr. Laurenti did have knowledge, or holding an evidentiary hearing if it is not certain of Mr. Laurenti's knowledge and therefore could have had the possibility of additional witnesses, including Mr. Laurienti. And what about the abuse of trust? Why isn't this record sufficient to show an abuse of trust? Well, Your Honor, Mr. Laurenti, I apologize, Your Honor. This Court redefined the proper test for abuse of trust in Contreras, the 2009 en banc case. Contreras seemed to be focused on the situation of an employee abusing trust with regard to his or her employer. Yes, Your Honor. It's not really clear that it was a more general statement. I believe it was, Your Honor, in the fact that it intended to narrow, significantly narrow the class of defendants who qualify for the abuse of trust enhancement. Contreras made it clear that it overruled the prior test in Hill, which is the extent to which the position provides the freedom to commit a difficult detect wrong. In Contreras, the Court held that the proper focus was whether the job inherently conveys substantial discretionary authority. The government heavily relies on Santoro in support of its position, I believe, in its briefing on page 18, in its position that Mr. Laurenti qualifies for the abuse of trust enhancement. Is there any Ninth Circuit case law about stockbrokers? There are, Your Honor. Which cases are those, Ninth Circuit cases? Ninth Circuit case, Your Honor? I believe Torolo. Which one? I believe Torolo, which was previously addressed in the prior appeal in this matter, Your Honor. Unfortunately, most of the cases that deal with the 78 FFA and stockbrokers come out of the Second Circuit. There's also the Eighth Circuit case of Behrens, where the Court specifically held that the defendant had the right to at least provide information as to his knowledge, and the Court reversed and remanded in Behrens because the defendant was not given the opportunity to do so. The Santoro case that you mentioned from the Second Circuit seems about as on point as you could find. It involves the exact same underlying conduct. Why shouldn't we follow the reasoning of that case here? Yes, Your Honor. The reason why it doesn't apply in this matter, Your Honor, first, it is an out-of-circuit case that was ruled on prior to Contreras. Contreras established the new rule in this circuit that the test is whether the job inherently conveys substantial discretionary authority. The Santoro case relies on the prior Hill standard that was explicitly overruled in the en banc ruling of Contreras. The Santoro standard was the defendant must abuse a trusted relationship or abuse a relationship of trust and confidence that enabled the defendant to commit the crime and escape detection. There, it was the focus that the defendant had the freedom to commit the crime. I think the Court there relied very heavily on the fact that the defendant had the discretion to recommend particular stocks, and that was the basis for finding that, in fact, he did exercise substantial discretionary authority. And it seems like the same is true of your client. Your Honor, I believe that the facts are different in this matter. Mr. Laurenti did not have the discretion to trade on his client's accounts without authorization. I'm talking about recommending stocks, though. And he did have that discretion, right? Your Honor, yes. We do not dispute that Mr. Laurenti did recommend, made recommendations and provided advice to his customers. And his customers relied on him to give them honest recommendations. And I don't understand why isn't that enough to meet the Contreras standard? Your Honor, Mr. Laurenti did provide advice and recommendations to his customers. However, his customers were, indeed, highly sophisticated. As they testified at trial, they had significant investing experience. I would like to note one example. What difference does that make? I mean, after all, you're dealing with a stockbroker, and we have a bit of testimony, not a whole lot, from some of the customers, how they relied upon his judgment. I mean, isn't that inherent in the nature between a stockbroker and a customer, however experienced somebody may be, particularly in something like this, the scheme that he was involved in? Well, Your Honor, I would like to note that the Sir case, the Second Circuit case, did hold that there was no general fiduciary duty. I understand that. Inherent in an ordinary broker-customer relationship. I do not believe here there was that fiduciary duty. Certainly, Mr. Crosby, one of Mr. Laurenti's customers, did not follow the advice of Mr. Laurenti. At one point, Mr. Laurenti advised him to take a million dollars straight up out of his account as pure profit. Mr. Crosby declined to do so because he wished to keep investing. Unfortunately, because the market crashed in 2000, there were losses suffered by Mr. Crosby and others. However, it's clear that Mr. Laurenti did not have any discretion over his customers' accounts, that he merely provided advice to his customers, very sophisticated clients, and they often did not follow his recommendations. Okay. Thank you very much. We'll give you a minute in rebuttal. Thank you. Thank you, Your Honor. May it please the Court, my name is Helen Meltzer. I represent the Department of Justice in this appeal. Can I just start you by focusing on one of the points that your opponent here made? Is it true that for the no-knowledge defense to getting a sentence of imprisonment, that the knowledge the defendant has to have is knowledge of the applicability of the rule to the specific conduct that's at issue? No, I disagree with that, Your Honor. I believe that it's knowledge of the actual rule and regulations. So in this case, it would be knowledge that there's a rule called 10b-5 that prohibits the commission of fraud in connection with the purchase or sale of securities. And I think that that's consistent with this Court's opinion in Reyes, which is at 557-310-69. At page – my eyes are failing me. I can't find the specific page number, I apologize. But the Court discusses the 15 U.S.C. 78-FF requirement. And it says here, the District Court framed the question as to whether Jensen had satisfied her burden of proving by a preponderance of the evidence that she was unaware of an SEC rule or regulation prohibiting the falsification of books and records. This was the proper formulation. So translating that to this case, it would be whether or not Mr. Loriente was aware of a rule that prohibited the commission of fraud in connection with the purchase or sale of securities. We disagree with the appellant in this case that he was entitled to an evidentiary hearing. He did not submit any factual proffer. As Judge Carr noted, this is the most basic of the anti-fraud rules within the Securities and Exchange Commission. But suppose he had said, I didn't realize, no one ever told me that not revealing a bonus commission or an extraordinary bonus commission was a violation of that. Well, he didn't even make that statement, Your Honor. The only information that was submitted to the Court was by his attorney. No, he didn't. I'm asking what if he had done that. If he had actually done that at sentencing, I think that this case went beyond bonus commissions. I thought your answer was going to be that that would be totally irrelevant because the only thing he has to know about is the existence of Rule 10b-5. I think it has to be connected with fraud and that 10b-5 prescribes fraud. But with respect to the specific conduct, that's an issue. Why would it matter if he didn't know that Rule 10b-5 required him to disclose these bonus commissions? If, according to what you started out, relying on the Reyes case was true, you would just say that's irrelevant. Yes, Your Honor. Okay. So I'm just confused now. Why was your answer, well, if he had said that, then the case went beyond just the bonus commission issue? Because the case did go beyond the bonus commissions. It was a pump-and-dump scheme. The Court found that there were other aspects to the conspiracy other than just bonus commissions. Well, there were, but his involvement seemed to have been he wasn't actually getting the pump, right? Only through the commissions. That's all he was getting. But he was encouraging the pump by trying to sell house stocks to his clients, stocks which were not in their interest, stocks which were in the interest of the company in terms of effectuating the pump. And also discouraging his customers from selling them. In terms of the no-net sales policy that Hampton Porter had. Correct, Your Honor. That when clients went to Mr. Loriente and said that they wanted a sale, it was always the time isn't right, the stock will go up. So it certainly was in his interest to retain those stocks within the client's accounts. What to go to the abuse of trust question. First of all, is there a Ninth Circuit stockbroker case? Not on point on abuse of trust that I'm aware of, Your Honor. Okay. So basically there are the Second Circuit cases? Santoro and the other Second Circuit cases, correct. I mean, what I have trouble with is this. Tell me how these stockbrokers are different than if I go to the Apple store to buy an iPhone. Or if I go to a high-tech electronics store and I say, which one of these should I buy? I think that in each case it should be a fact-based inquiry. I don't think that the government in this case is suggesting that every single time that somebody has a broker, there's necessarily an abuse of trust. Or a broker who suggests stocks. So what's the line? The line in this case is that Mr. Loriente had a very special, non-ordinary commercial relationship with his clients. These were people who had been cold-called by other brokers within the firm. They didn't go to the firm and say, I selected this stock. I would like you to purchase it for me, as I have done with my own broker. He called them and suggested these particular stocks that were not in their interest. It was in his interest and in the interest of his brother and the other people at the firm. A lot of them were ñ none of them had any prior knowledge. Anybody who is a sophisticated investor would know that stockbrokers are not fiduciaries and it's a hands-length commercial relationship, basically. And if they choose to rely on them, I don't see why their reliance is different than when you buy any complicated product and you rely on the salesperson to advise you as to what to buy. What's the difference? Because if you go to the Apple store to buy an iPod, you haven't established this relationship of trust with the ñ It's not a continuing relationship, either. And there certainly ñ It's not that hypo. There were multi-month or year relationships with some of these clients. But you're right, there weren't continuing relationships. But there also ñ if I go to the Apple store, I am not placing my trust in somebody that supposedly knows about my financial situation, knows about my family situation, and is going to make recommendations. No, but they're going to ask you what you want it for and how do you use it. I mean, it's not finances, but there's nothing in this statute that has directly to do with finances. But there's still not the same type of relationship with the clients who testified as Mr. Rodriguez did. I trusted him. I believed in him. Mr. Rodriguez took a golf trip with Mr. Luriente to Tijuana, Mexico. Mr. Crosby had Mr. Luriente's cell phone number and his home telephone number, and he'd call him. I don't have that kind of relationship with employees at the Apple store. I think it's completely different. And I think that, especially as to Mr. Crosby's account, he did exercise ñ Mr. Luriente did exercise de facto control over the account. In April of 2000, Mr. Luriente called him and told him that he thought that they should purchase more on-point stock. And Mr. Crosby wasn't sure, but he said, I trust you, do what's best for our account. He didn't tell him how much to purchase, and Mr. Luriente ended up purchasing $1 million of on-point stock in that account. If that is not the equivalent of a discretionary account, even if they don't have a specific contract as to discretion, I'm not sure what really is. And Mr. Crosby's testimony appears on pages 68 through 71 of the November 9, 2006, transcript. We have no case law on this, and it seems like an important question. How would you ask us to define the point at which a stockbroker relationship becomes a trust relationship? I suppose when the client puts their trust ñ when there's a trust relationship where the client puts their trust in the broker to exercise judgment that is in their best interest. Or perhaps where there's a continuing relationship where the broker gives specific advice, and at least on frequent occasion, the client acts upon that advice,  because then the next point would be a conflict of interest or undisclosed commissions or whatever. And just briefly, how does this fit within Contreras? Or is Contreras about something else? No, I think Contreras does control to an extent, because Contreras said that the position must involve professional or managerial discretion that significantly facilitates the commission or concealment of the offense. And I think that Mr. Luriente did have professional discretion, and that discretion facilitated the commission of the securities fraud in this case. Unless the court has ñ His professional discretion was what? To recommend stocks and then discretion in terms of the Crosby account to actually make those purchases. You know, I think professional means a profession in the usual sense of the word. Lawyer, doctor, accountant. Broker is certainly a profession. It is. He's licensed, right? He certainly was a registered representative, yes, Your Honor. Unless the court has any other questions. Thank you. Okay. Thank you very much. The Court is going to take a short break. She wants some rebuttal. Oh, I'm sorry. One minute in rebuttal. I'm sorry. I apologize. No, that's fine. Thank you for catching up. Thank you, Your Honor. First, I'd like to issue a correction. I reviewed the Tarallo case, and that is actually about a telemarketer. It appears that there is a dearth of cases in Ninth Circuit specifically concerning stockbrokers. Many of these cases do involve 78 FFA. However, they involve other types of marketing schemes as opposed to a broker-customer relationship. Do you have authority that contradicts the Reyes case that your opponent relied on for the extent of the knowledge that's at issue? Well, Your Honor, I would argue that the reason why 78 FFA became or was enacted because Congress was concerned that people could be imprisoned for acts that aren't patently obvious, 10b-5 is an extremely broadly worded statute. I believe the government mentions that in its briefing. Just the fact that he did not know of 10b-5 isn't enough.  So what's the authority that you ñ she cites the Reyes case. What authority do you cite to back up your assertion? That more is necessary. O'Hagan is certainly one case. Also Barron's, an Eighth Circuit case. O'Hagan is a Supreme Court case that specifies the no-knowledge clause is a safeguard, that specifically states the defendant may not be imprisoned for violating Rule 10b-5 if he proves he had no knowledge of the rule, and endorsed the position that the no-knowledge defense is available to violators of 78B ñ sorry, 78JB, of which Mr. Lorienti was convicted. That seems to be exactly the contrary of your position. You just said knowledge of the rule. That's the whole point. Is it just knowledge of the rule, or is it knowledge of the rule's applicability to specific conduct? Knowledge of the rule's applicability to certain conduct, Your Honor. That makes sense to me, because if it's because 10b-5 is so broad, before a defendant has the benefit of escaping the risk of being imprisoned, he ought to be required and given the opportunity to show, well, I didn't know that this was within that rule. Sure, I knew I couldn't do this, that, and the other thing. In terms of if I understand how the rule ought to be operating, it ought to encompass the nexus. If the defendant shows the nexus between the particular conduct and how it was covered by Rule 10b-5, just the general ignorance of the rule, it's as implausible as it is here. That's all it is. This rule, that doctrine will never be applicable. How could any stockbroker say, I never heard of 10b-5? Exactly, Your Honor. That would be our position in this case, Your Honor. But you never came in with a piece of paper saying, I didn't realize that it applied to. That's right. That's the other problem he has here. Your Honor, Mr. Lorienti did present a general proffer through his attorney. Which was what? Coupled with a request for an evidentiary hearing. Which was exactly what? That he had no knowledge of the rule that he was convicted of violating. Coupled with a request with an evidentiary hearing, trial counsel relied on the fact that there may have been either a factual finding by the district court or an evidentiary hearing where this could be fleshed out in more detail. Mr. Lorienti certainly could have been put on the stand or other witnesses and certainly they would be said what he said. He said I didn't know about the rule? Not necessarily the rule, but the specific fact. What did he say? You're characterizing what the attorney said as the proffer. What did the attorney say? The attorney stated that Mr. Lorienti had no knowledge of the rules or regulations of which he was convicted of violating. Okay. Thank you very much. Thank you for your time. Thank you, Your Honor. And your behalf in this case. The case of United States v. Lorienti is submitted.
judges: Carr, Berzon, Watford